UNITED STATES DISTRICT COURT

DISTRICT OF NEVADA

| | |
|---|---|
| NICOLAI MORK,<br><br>　　Plaintiff<br><br>v.<br><br>PERRY RUSSELL, et al.,<br><br>　　Defendants | Case No.: 3:21-cv-00077-MMD-CSD<br><br>**Report & Recommendation of<br>United States Magistrate Judge**<br><br>Re: ECF No. 63 |

　　This Report and Recommendation is made to the Honorable Miranda M. Du, Chief United States District Judge. The action was referred to the undersigned Magistrate Judge pursuant to 28 U.S.C. § 636(b)(1)(B) and the Local Rules of Practice, LR 1B 1-4.

　　Before the court is Defendants' motion for summary judgment. (ECF Nos. 63, 63-1 to 63-7, 65-1.) Plaintiff filed a response. (ECF No. 66.) Defendants filed a reply. (ECF No. 67.)

　　After a thorough review, it is recommended that Defendants' motion be denied. However, Plaintiff indicates that he has agreed to dismissal of his claim against defendant Russell, and that claim should be dismissed with prejudice.

## I. BACKGROUND

　　On February 9, 2021, Plaintiff filed his complaint asserting civil rights violations under 42 U.S.C. § 1983, that stem from events that allegedly took place while he was an inmate housed at the Stewart Conservation Camp (SCC), a facility operated by the Nevada Department of Corrections (NDOC). The court screened his complaint and allowed him to proceed with Eighth Amendment deliberate indifference to serious dental and medical needs claims against defendants Henderson and Dr. Naughton, as well as an Eighth Amendment conditions of confinement claim concerning the COVID-19 pandemic against Russell. (ECF No. 7.)

1    Plaintiff indicates in his response to Defendants' motion that he has agreed to dismissal
2 of his Eighth Amendment claim against defendant Russell. (ECF No. 66 at 1.) Therefore, this
3 claim shall be dismissed with prejudice, and the court will focus only on the Eighth Amendment
4 claims against defendants Henderson and Dr. Naughton.
5    With respect to Henderson, Plaintiff alleges that he told her that he had a rotten tooth,
6 which was turning black and causing him extreme pain. Over the next 10 months, he continued
7 to seek treatment as his tooth got worse and the problem spread to surrounding teeth. He claims
8 that he continued to suffer in pain, but Henderson did not take any action to help him.
9    Plaintiff's claim against Dr. Naughton is based on allegations that Dr. Naughton
10 threatened to move Plaintiff to a high-security prison if Plaintiff continued to seek medical care
11 for his rash, and as a result he continued to suffer from terrible itching and skin disfigurement.
12    Shortly after the court screened his complaint, Plaintiff filed a notice of change of address
13 indicating he was no longer in custody. (ECF No. 9.)
14    Defendants move for summary judgment, arguing: they are entitled to qualified immunity
15 because they did not violate Plaintiff's Eighth Amendment rights and those rights were not
16 clearly established, and Plaintiff failed to exhaust his administrative remedies.

## II. LEGAL STANDARD

18    The legal standard governing this motion is well settled: a party is entitled to summary
19 judgment when "the movant shows that there is no genuine issue as to any material fact and the
20 movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see also Celotex Corp.*
21 *v. Cartrett*, 477 U.S. 317, 330 (1986) (citing Fed. R. Civ. P. 56(c)). An issue is "genuine" if the
22 evidence would permit a reasonable jury to return a verdict for the nonmoving party. *Anderson v.*
23 *Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986). A fact is "material" if it could affect the outcome

of the case. *Id*. at 248 (disputes over facts that might affect the outcome will preclude summary judgment, but factual disputes which are irrelevant or unnecessary are not considered). On the other hand, where reasonable minds could differ on the material facts at issue, summary judgment is not appropriate. *Anderson*, 477 U.S. at 250.

"The purpose of summary judgment is to avoid unnecessary trials when there is no dispute as to the facts before the court." *Northwest Motorcycle Ass'n v. U.S. Dep't of Agric.*, 18 F.3d 1468, 1471 (9th Cir. 1994) (citation omitted); *see also Celotex,* 477 U.S. at 323-24 (purpose of summary judgment is "to isolate and dispose of factually unsupported claims"); *Anderson,* 477 U.S. at 252 (purpose of summary judgment is to determine whether a case "is so one-sided that one party must prevail as a matter of law"). In considering a motion for summary judgment, all reasonable inferences are drawn in the light most favorable to the non-moving party. *In re Slatkin*, 525 F.3d 805, 810 (9th Cir. 2008) (citation omitted); *Kaiser Cement Corp. v. Fischbach & Moore Inc.*, 793 F.2d 1100, 1103 (9th Cir. 1986). That being said, "if the evidence of the nonmoving party "is not significantly probative, summary judgment may be granted." *Anderson,* 477 U.S. at 249-250 (citations omitted). The court's function is not to weigh the evidence and determine the truth or to make credibility determinations. *Celotex,* 477 U.S. at 249, 255; *Anderson*, 477 U.S. at 249.

In deciding a motion for summary judgment, the court applies a burden-shifting analysis. "When the party moving for summary judgment would bear the burden of proof at trial, 'it must come forward with evidence which would entitle it to a directed verdict if the evidence went uncontroverted at trial.'… In such a case, the moving party has the initial burden of establishing the absence of a genuine [dispute] of fact on each issue material to its case." *C.A.R. Transp. Brokerage Co. v. Darden Rest., Inc.*, 213 F.3d 474, 480 (9th Cir. 2000) (internal citations

omitted). In contrast, when the nonmoving party bears the burden of proving the claim or defense, the moving party can meet its burden in two ways: (1) by presenting evidence to negate an essential element of the nonmoving party's case; or (2) by demonstrating that the nonmoving party cannot establish an element essential to that party's case on which that party will have the burden of proof at trial. *See Celotex Corp. v. Cartrett*, 477 U.S. 317, 323-25 (1986).

If the moving party satisfies its initial burden, the burden shifts to the opposing party to establish that a genuine dispute exists as to a material fact. *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). The opposing party need not establish a genuine dispute of material fact conclusively in its favor. It is sufficient that "the claimed factual dispute be shown to require a jury or judge to resolve the parties' differing versions of truth at trial." *T.W. Elec. Serv., Inc. v. Pac. Elec. Contractors Ass'n*, 809 F.2d 626, 630 (9th Cir. 1987) (quotation marks and citation omitted). The nonmoving party cannot avoid summary judgment by relying solely on conclusory allegations that are unsupported by factual data. *Matsushita*, 475 U.S. at 587. Instead, the opposition must go beyond the assertions and allegations of the pleadings and set forth specific facts by producing competent evidence that shows a genuine dispute of material fact for trial. *Celotex*, 477 U.S. at 324.

### III. DISCUSSION

**A. Exhaustion**

Defendants argue that plaintiff failed to exhaust his administrative remedies because he did not file a grievance addressing the allegations set forth in the complaint.

The Prison Litigation Reform Act (PLRA) provides that "[n]o action shall be brought with respect to prison conditions under section 1983 of this title, or any other Federal law, by a prisoner confined in any jail, prison, or other correctional facility until such administrative

4

remedies as are available are exhausted." 42 U.S.C. § 1997e(a). An inmate must exhaust his administrative remedies irrespective of the forms of relief sought and offered through administrative avenues. *Booth v. Churner*, 532 U.S. 731, 741 (2001).

The failure to exhaust administrative remedies is "'an affirmative defense the defendant *must plead and prove*.'" *Albino v. Baca*, 747 F.3d 1162, 1166 (9th Cir. 2014) (quoting *Jones v. Bock*, 549 U.S. 199, 204, 216 (2007) (emphasis added).

To support their argument, Defendants point to their Exhibit E, which is supposed to contain Plaintiff's inmate grievance history. (ECF No. 63-5.) Defendants did not actually submit Plaintiff's inmate grievance history or any other *evidence* to demonstrate that Plaintiff failed to exhaust his administrative remedies.[1] Therefore, Defendants' motion should be denied insofar as they argue Plaintiff failed to exhaust administrative remedies as they have not met their burden of proving this affirmative defense.

**B. Eighth Amendment Deliberate Indifference**

"The government has an 'obligation to provide medical care for those whom it is punishing by incarceration,' and failure to meet that obligation can constitute an Eighth Amendment violation cognizable under § 1983." *Colwell v. Bannister,* 753 F.3d 1060, 1066 (9th Cir. 2014) (citing *Estelle v. Gamble*, 429 U.S. 97, 103-05 (1976)).

A prisoner can establish an Eighth Amendment violation arising from deficient medical care if he can prove that prison officials were deliberately indifferent to a serious medical need. *Estelle*, 429 U.S. at 104. A claim for deliberate indifference involves the examination of two elements: "the seriousness of the prisoner's medical need and the nature of the defendant's response to that need." *McGuckin v. Smith*, 974 F.2d 1050, 1059 (9th Cir. 1992), *rev'd on other*

---

[1] There is a title page but no substantive documentation in Exhibit E. (ECF No. 63-5.)

grounds, *WMX Tech, Inc. v. Miller*, 104 F.3d 1133 (9th Cir. 1997); *see also Akhtar v. Mesa*, 698 F.3d 1202, 1213 (9th Cir. 2012) (quoting *Jett v. Penner*, 439 F.3d 1091, 1096 (9th Cir. 2006)). "A 'serious' medical need exists if the failure to treat a prisoner's condition could result in further significant injury or the 'unnecessary and wanton infliction of pain.'" *McGuckin*, 974 F.2d at 1059 (citing *Estelle*, 429 U.S. at 104); *see also Akhtar*, 698 F.3d at 1213. Examples of conditions that are "serious" in nature include "an injury that a reasonable doctor or patient would find important and worthy of comment or treatment; the presence of a medical condition that significantly affects an individual's daily activities; or the existence of chronic and substantial pain." *McGuckin*, 974 F.2d at 1059-60; *see also Lopez v. Smith*, 203 F.3d 1122, 1131 (9th Cir. 2000) (citation omitted) (finding that inmate whose jaw was broken and mouth was wired shut for several months demonstrated a serious medical need).

If the medical need is "serious," the plaintiff must show that the defendant acted with deliberate indifference to that need. *Estelle*, 429 U.S. at 104; *Akhtar*, 698 F.3d at 1213 (citation omitted). "Deliberate indifference is a high legal standard." *Toguchi v. Chung*, 391 F.3d 1051, 1060 (9th Cir. 2004). Deliberate indifference entails something more than medical malpractice or even gross negligence. *Id*. Inadvertence, by itself, is insufficient to establish a cause of action under section 1983. *McGuckin*, 974 F.2d at 1060. Instead, deliberate indifference is only present when a prison official "knows of and disregards an excessive risk to inmate health or safety; the official must both be aware of the facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." *Farmer v. Brennan*, 511 U.S. 825, 837 (1994); *see also Akhtar*, 698 F.3d at 1213 (citation omitted).

Deliberate indifference exists when a prison official "den[ies], delay[s] or intentionally interfere[s] with medical treatment, or it may be shown by the way in which prison officials

provide medical care." *Crowley v. Bannister*, 734 F.3d 967, 978 (9th Cir. 2013) (internal quotation marks and citation omitted).

### 1. Henderson

First, Henderson argues that there is no evidence that Plaintiff suffered from a serious dental need. Henderson contends that Plaintiff had the opportunity to meet with a correctional caseworker on numerous occasions and discuss things, including medical treatment, while at SCC. Henderson acknowledges that Plaintiff was not present for those encounters, but asserts he had an opportunity to update any information he felt necessary. Notations from May 15, 2020, October 21, 2020, March 9, 2021, and March 23, 2021, include a reference to "DEN 1/1," which is a code from the medical dental department and indicates that "no dental care" is needed or that the inmate "requires minimal comprehensive dental treatment." (ECF No. 63-2.)

Second, Henderson argues she was not deliberately indifferent to Plaintiff's dental needs. She states that after reviewing Plaintiff's request forms (known as "kites"), she would provide them to the dental department for appropriate scheduling, and policy required her to sort each medical kite between medical or dental and give it to the appropriate department for follow up. Henderson maintains she did not have a role in scheduling Plaintiff for dental appointments, but she would send any dental kites to the dental department. She contends that she responded to one kite addressing Plaintiff's dental care; however, that kite was addressed to the medical department to receive stronger pain medication. (Henderson Decl., ECF No. 63-3.)

Henderson points to evidence that there are notations of "DEN 1/1" in Plaintiff's institutional records to support her argument that Plaintiff did not suffer from serious dental needs. Plaintiff, on the other hand, states that he never spoke to a caseworker about his dental

health, and he does not know what "DEN 1/1" means. He was never aware that a caseworker entered any notes about his dental health. (Pl. Decl., ECF No. 66 at 48 ¶ 55.) In addition, Plaintiff presents evidence that he submitted numerous kites complaining of dental issues and pain and requesting pain medication, between March 2, 2020, and February 2021. (*See* ECF No. 66 at 59, 68, 69, 70, 71, 72, 73, 74.) In addition, his records corroborate his statement that he finally saw a dentist on March 11, 2021, shortly before he was released on parole, and a procedure was performed, and he was prescribed Acetaminophen and Amoxicillin. (ECF No. 66 at 77.) Thus, Plaintiff has presented evidence to create a genuine dispute of material fact as to whether he had a serious dental need.

Henderson also argues she only sorted the kites and forwarded dental kites to the dental department for follow-up. Henderson acknowledges that she responded to at least one kite regarding Plaintiff's dental needs, although this kite was addressed the medical department because Plaintiff sought a stronger pain medication.

In his declaration, Plaintiff states that he approached Henderson about his teeth when they became painful, and she told him to send a kite, which he did on March 18, 2020. (Pl. Decl., ECF No. 66 at 36 ¶ 18.)

In April, he continued to tell Henderson that his teeth were extremely painful, and he needed to be seen as soon as possible. Henderson said he was getting to be a real troublemaker. (*Id*. at 37-38 ¶ 22.) During the summer, his teeth continued to get worse, and he kept seeing Henderson to ask to be seen immediately for his teeth. He told her his teeth hurt all the time, and this often prevented him from sleeping. She repeatedly told him he would have to wait and tough it out. Plaintiff also asked for prescription pain medications, or at least a prescription for Tylenol, but she denied his request. She sometimes gave him a few sample packets of Tylenol, but that

was only enough to last for part of one day. (*Id*. at 40 ¶ 32.) By mid-August, he claims that the pain from his teeth eclipsed that from his rash, and he continued to see Henderson and stress how painful his teeth were. (*Id*. ¶ 35.)

At the end of September, he continued asking Henderson for help, and she told him that he should not ask for help so often or send so many kites, and he should buy ibuprofen from the store and wait and tough it out. He told her that the store did not have ibuprofen, and even when they did, he was only able to buy an inadequate supply. He asked her for a stronger pain medication, and she said she would not ask them to do that for dental pain. She continued to give Plaintiff only less than a two-day supply of Tylenol per week. (*Id*. at 41-42 ¶ 37.) For approximately six months, Plaintiff asserts that he went to see Henderson about his teeth pain and the need for stronger and more pain medication. (*Id*. ¶ 39.)

Plaintiff also states that Henderson told him she had helped other inmates get scheduled to see the dentist earlier by acting as a liaison with dental, although other times she told him she had no real say. He told her that the Tylenol packets were inadequate. (*Id*. at 42-43 ¶¶ 40, 43.)

When Plaintiff asked correctional officers what to do about his pain, they told him to speak with Henderson, and she could help him be seen earlier and to get the pain medication he needed. (*Id*. ¶ 45.)

On March 10, 2021, one week before he was supposed to be released on parole, he received a notice stating that he would finally be seen by dental. He claims that Henderson called him to the office and asked him to sign a waiver stating that he did not want to be seen (because he was going to be released), but he refused to sign the waiver. (*Id*. ¶ 48.) The following day, Plaintiff saw the prison dentist, who found that Plaintiff's teeth were infected and many were in urgent need of extraction. (*Id*. ¶ 49.) Plaintiff was released on March 23, 2021, and immediately

scheduled a dental appointment, and he has had to have numerous dental appointments, extractions, and implants placed. (*Id.* ¶ 53.)

According to Plaintiff, Henderson was the point person and gatekeeper for all health care, including dental care, at SCC. She was almost always the only person on site that could see an inmate for a health need, and she was a "conduit" for pain medication. Specialists, such as dentists and doctors, were at other locations. Doctors only briefly visited SCC, and dentists never did. In order to get health or dental care, Plaintiff maintains that inmates first had to convince Henderson that the need was sufficient to justify the request. He went to her continuously about his dental needs and discussed his dental kites with her. (*Id.* at 48 ¶ 56.)

"Dental care is one of the most important medical needs of inmates." *Hunt v. Dental Dept.*, 865 F.2d 198, 200 (9th Cir. 1989) (quoting *Ramos v. Lamm*, 639 F.2d 559, 576 (10th Cir. 1980)). "[T]he [E]ighth [A]mendment requires that prisoners be provided with a system of ready access to adequate dental care." *Id.* (citing *Hoptowit v. Ray*, 682 F.2d 1237, 1253 (9th Cir. 1982)).

While Henderson claims she had no involvement in Plaintiff's requests for dental care, Plaintiff's evidence directly refutes this. According to Plaintiff, she did review his kites, and he spoke with her numerous times about his dental pain, and asked that she intervene to get him seen earlier. Even if it is true that Henderson had no control over dental scheduling, Plaintiff presents evidence that he also frequently advised her that the limited over the counter medications he had access to were inadequate for the pain he was experiencing in his teeth. She provided him only with sample packets of Tylenol that were deficient in controlling his pain and were not adequate in amount.

Plaintiff has also submitted evidence to create a genuine dispute of fact as to whether Henderson was deliberately indifferent to his serious dental needs. Therefore, the motion for summary judgment should be denied as to Henderson.

**2. Dr. Naughton**

Dr. Naughton does not argue that Plaintiff's rash was not a serious medical need. Therefore, the court will focus on the subjective prong of this claim.

Dr. Naughton is correct that this claim is limited to Plaintiff's allegation that Dr. Naughton threatened to transfer Plaintiff to a high security prison if he continued to seek medical care for his rash.

Dr. Naughton maintains that after trying several treatment options for Plaintiff's rash with no success, he reviewed Plaintiff's medications and one of the side effects of one medication was a rash. So, Dr. Naughton asked him to stop taking that medication to see if it was an allergic reaction to the medication. (Naughton Decl., ECF no. 63-4 ¶ 7.) He asserts that when Plaintiff requested referral to a dermatologist, he agreed that it was time for such a referral. (*Id.* ¶ 8.) According to Dr. Naughton, he could not find a dermatologist in Reno or Carson City that would agree to see Plaintiff. However, there were several dermatologists in Las Vegas that were accepting referrals from inmates. (*Id.* ¶¶ 9, 10.) Dr. Naughton claims he made an appointment for Plaintiff to see a dermatologist in Las Vegas. (*Id.* ¶ 11.) He advised Plaintiff he would be evaluated by a dermatologist in Las Vegas, and then would be sent back to SCC, but Plaintiff refused to go to the referral in Las Vegas. (*Id.* ¶¶ 13-14.) He also said the medications he had were helping his symptoms. (*Id.* ¶ 14.) Dr. Naughton states that he did not have the authority to send anyone to another facility unless it was to see a specialist for medical treatment that he could not provide. (*Id.* ¶ 16.)

Plaintiff, on the other hand, provides a declaration stating that Dr. Naughton told him he would not be able to see a dermatologist while in prison. (ECF No. 66 at 35 ¶ 13.) By the end of March 2020, his rash was extremely severe and uncomfortable, and Dr. Naughton continued to insist it was the laundry detergent (that Plaintiff was no longer using). At that point, Plaintiff sent a kite asking to see a dermatologist. (*Id*. at 36-37 ¶ 19.) At an appointment with Dr. Naughton on March 26, 2020, he asked to see a dermatologist, and Dr. Naughton told him there was no way he would see a dermatologist. (*Id.*)

Dr. Naughton was gone in April 2020, but when he returned and saw Plaintiff in May, he acknowledged that Plaintiff's rash had not improved. (*Id*. ¶ 24.) Dr. Naughton looked at Plaintiff's medications and said that a rash was a side effect of Trazadone, although Plaintiff had been taking that for years before the rash appeared. He claims Dr. Naughton advised him to stop taking *all* of his medications. (*Id*. ¶ 26.)

On May 21, 2020, Plaintiff saw Dr. Naughton, and at that point, the rash covered most of his body and caused him pain and sleep deprivation. At that appointment, Plaintiff asserts that Dr. Naughton told him that he would not see Plaintiff anymore for his rash, and if Plaintiff tried to keep getting treatment for the rash, Dr. Naughton would send him to High Desert State Prison (HDSP)—a high security prison. He told Plaintiff to put in a kite and ask not to be seen anymore in order to ensure that Dr. Naughton did not have to transfer him. (*Id*. ¶ 28.) Plaintiff believed that Dr. Naughton would follow through on his threat to move him to a high security prison if he had not sent the kite to discontinue care. (*Id*. ¶ 64.) Plaintiff says that Dr. Naughton's threat had the effect of denying him urgently needed medical care for the next nine months. (*Id*. ¶ 29.)

Plaintiff also points out that there is no medical record provided by Dr. Naughton that demonstrates a referral was made or an appointment scheduled for Plaintiff to see a dermatologist in Las Vegas.

In addition, even if Dr. Naughton did not have actual authority to send an inmate to another facility unless it was for medical reasons, Plaintiff claims Dr. Naughton could have easily made up a medical reason to have an inmate transferred, and Plaintiff believed Dr. Naughton had the authority to do so and for that reason, he did not seek further treatment for his rash.

The court finds that Plaintiff has raised a genuine dispute of material fact as to whether Dr. Naughton threatened him so that he would not seek further medical care for his rash. Therefore, summary judgment should be denied as to Dr. Naughton.

**C. Qualified Immunity**

Defendants argue they did not violate Plaintiff's Eighth Amendment rights, and they were not on clear notice that their actions would violate the Eighth Amendment.

"In evaluating a grant of qualified immunity, a court considers whether (1) the state actor's conduct violated a constitutional right and (2) the right was clearly established at the time of the alleged misconduct." *Gordon v. County of Orange*, 6 F.4th 961, 967-68 (9th Cir. 2021) (citing *Saucier v. Katz,* 533 U.S. 194, 200-01 (2001), *overruled in part by Pearson v. Callahan*, 555 U.S. 223 (2009)).

Taking the facts in the light most favorable to Plaintiff, the fact finder could determine that Defendants did violate his Eighth Amendment rights. Moreover, the court finds that those rights were clearly established. It was clearly established that denying an inmate medical care (here by virtue of a threat that made him stop seeking care) can violate the Eighth Amendment. It

Case 3:21-cv-00077-MMD-CSD   Document 68   Filed 11/14/23   Page 14 of 14

was likewise clearly established that inmates have ready access to adequate dental care, which would include access to medication to alleviate their pain.

### IV. RECOMMENDATION

IT IS HEREBY RECOMMENDED that the District Judge enter an order **DENYING** Defendants' motion for summary judgment (ECF No. 63); however, Plaintiff's Eighth Amendment claim against defendant Russell should be **DISMISSED WITH PREJUDICE**.

The parties should be aware of the following:

1. That they may file, pursuant to 28 U.S.C. § 636(b)(1)(C), specific written objections to this Report and Recommendation within fourteen days of being served with a copy of the Report and Recommendation. These objections should be titled "Objections to Magistrate Judge's Report and Recommendation" and should be accompanied by points and authorities for consideration by the district judge.

2. That this Report and Recommendation is not an appealable order and that any notice of appeal pursuant to Rule 4(a)(1) of the Federal Rules of Appellate Procedure should not be filed until entry of judgment by the district court.

Dated: November 14, 2023

_____
Craig S. Denney
United States Magistrate Judge

14